1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ERIC HOFMANN, an individual and on
behalf of all others similarly situated,

                                    Plaintiff,

v.

PEG PEREGO U.S.A., INC.,

                                    Defendant.

Case No.:  3:14-CV-2227-CAB-JLB

**FINAL APPROVAL OF CLASS
SETTLEMENT AND AWARD OF
ATTORNEYS' FEES**

This matter is before the Court on Plaintiff's unopposed motion for final approval of class action settlement [Doc. No. 34], and Plaintiff's unopposed motion for attorney's fees [Doc. No 35].  The Court held a hearing on these motions on October 15, 2015.  As discussed below, the motion for final approval is granted, and the motion for attorney's fees is granted in part.

**I.      Background**

On August 11, 2014, Plaintiff filed a complaint against Defendant in San Diego County Superior Court "on behalf of all purchasers of children's riding vehicles . . . manufactured, distributed, marketed, and/or sold by [Defendant] in California that were labeled as 'Made in USA' or 'Made in U.S.A." *See* Compl. at ¶ 1.  The complaint alleged that these vehicles "were manufactured or produced from <u>component parts</u> that were

1

manufactured outside of the United States in violation of California law."  *Id.* at ¶ 3 (emphasis in original).  For his part, Plaintiff alleged that he purchased one of the allegedly mislabeled vehicles on June 5, 2014, and that he "suffered an 'injury in fact' because [his] money was taken by Defendants as a result of Defendants' false 'Made in USA' claim set forth on the offending product" and "by paying for something he believed was genuinely manufactured in the USA, when it was not." *Id.* at ¶¶ 16, 19.

Based on these substantive allegations, the complaint asserted claims for violation of California Business and Professions Code sections 17200 and 17533.7 and the California Consumer Legal Remedies Act (Cal. Civ. Code §1750 *et seq.*).  The complaint prayed for restitution, rescission and refunds of the vehicle purchase price, attorneys' fees, and punitive damages.

On September 18, 2014, Defendant removed the lawsuit to this court based on diversity jurisdiction under the Class Action Fairness Act ("CAFA").  The notice of removal included a declaration from Defendant's director of finance that Defendant had sold more than $5,000,000 in products at issue in the complaint in California during the four year class period.

On September 22, 2014, Magistrate Judge Burkhardt issued an order setting an early neutral evaluation conference ("ENE") for October 15, 2015.  [Doc. No. 3.]  On October 6, 2015, the parties jointly moved for the ENE to be taken off calendar to give the parties time to resolve their dispute through private mediation.  [Doc. No. 4.]  That motion was granted and the ENE was rescheduled for December 9, 2014.  [Doc. No. 5.]

On November 11, 2014, the parties reached a settlement in principle at a private mediation.  [Doc. No. 27-2 at 10; Doc. No. 35-3 at ¶ 13.]  Yet, for reasons unexplained by the record, the parties did not inform the Court, and even appear to have gone out of their way to keep the Court in the dark about their settlement.  Indeed, the docket indicates that counsel for the parties participated in a telephonic ENE with Magistrate Judge Burkhardt on December 9, 2014, but did not notify her of their settlement in principle.  [Doc. No. 11.] Then on January 12, 2015, the parties filed a joint discovery plan where they explicitly

state that the case did not settle at the mediation.  [Doc. No. 12.]  Finally, on March 13, 2015, the parties filed a joint motion to stay deadlines in light of their settlement, as well as a motion for leave to file an amended complaint.  [Doc. Nos. 17, 18.]  The Court granted the motions, and on March 17, 2015, Plaintiff filed an amended complaint that asserted the same claims but on behalf of a purported nationwide class of purchasers of Defendant's children's riding vehicles.  [Doc. No. 20.]  Still, the parties waited almost three additional months to file a motion for preliminary approval of the settlement on June 5, 2015.  [Doc. No. 27.]

The essence of the parties' June 1, 2015 Settlement Agreement is that, in exchange for a release of claims by the plaintiff class, Defendant will (1) provide each class member who submits a claim form one children's safety vest; (2) donate children's riding toys with a retail value of $400,000 to various charities over the course of five years; and (3) agree to comply with California Business and Professions Code Section 17533.7, so long as it is still in effect.[1]  The agreement does not require Defendant to relabel any packages already in the stream of commerce.

On June 5, 2015, Plaintiffs filed an unopposed motion for preliminary approval of their settlement.  [Doc. No. 27.]  The Court granted this motion and preliminarily approved the settlement on June 19, 2015.  [Doc. No. 31.]  The preliminary approval order set a final approval hearing for October 15, 2015.  The final approval hearing took place as scheduled on October 15, 2015.  Counsel for both parties attended.  No class members filed objections to the settlement, and no class members attended the hearing.  However, two class members had previously requested exclusion from the settlement in writing.

## II.      Final Approval of Settlement

### A.      Certification of the Settlement Class

The settlement here envisions certification of a nationwide class of "all persons who

---

[1] The Settlement Agreement specifies that if Section 17533.7 is amended, Defendant only agrees to comply with the statute in its amended or reinterpreted form.

purchased a Class Product between August 11, 2010 and December 31, 2014."[2] [Doc. No. 27-2 at 12.] A court "must pay 'undiluted, even heightened, attention' to class certification requirements in a settlement context." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). Thus, before approving the settlement itself, the Court's "threshold task is to ascertain whether the proposed settlement class satisfies the requirements of Rule 23(a) of the Federal Rules of Civil Procedure applicable to all class actions, namely: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation." *Id.* In addition, the Court must determine whether class counsel is adequate (Fed. R.Civ. P. 23(g)), and whether "the action is maintainable under Rule 23(b)(1), (2), or (3)." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000) (quoting *Amchem Prod. v. Windsor*, 521 U.S. 591, 614 (1997)).

### 1. Numerosity

This requirement is satisfied if the class is "so numerous that joinder of all members is impracticable." Fed. R.Civ. P. 23(a)(1). Although the "requirement is not tied to any fixed numerical threshold . . . courts find the numerosity requirement satisfied when a class includes at least 40 members." *Rannis v. Recchia*, 380 Fed. App'x 646, 651 (9th Cir. 2010). Here, notice and proof of claim forms were mailed to over 30,000 potential class members and over 13,000 class members have returned completed claim forms. Joinder of all these potential plaintiffs would be impracticable. Accordingly, this requirement has been met.

### 2. Commonality

This requirement is satisfied if "there are questions of law or fact common to the class." Fed. R.Civ. P. 23(a)(2). The Ninth Circuit construes this requirement permissively. *Hanlon*, 150 F.3d at 1019. "To satisfy the commonality requirement, plaintiffs need only point to a single issue common to the class." *Vasquez v. Coast Valley Roofing, Inc.*, 670 F. Supp. 2d 1114, 1121 (E.D. Cal. 2009). Here, the commonality requirement is satisfied

---

[2] "Class Products" is defined as "the 38 Peg Perego children's riding vehicle products identified in Exhibit G that contained an unqualified 'Made in USA' label." [Doc. No. 27-2 at 12-13.]

because all of the class claims concern whether Defendant improperly labeled its products as "Made in the USA" in violation of California law.

### 3.   Typicality

This requirement is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R.Civ. P. 23(a)(3).  "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020.  "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought. The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal quotations and citation omitted).  Here, the typicality requirement is satisfied because the claims of Plaintiff and the class are the same.  The wrongful conduct alleged in the complaint (the mislabeling of the products) is not unique to the class representative, and the damages to the class members, if any, are similar insofar as they relate to any diminished value of the products.

### 4.   Adequacy of Class Representative

The final Rule 23(a) requirement is that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R.Civ. P. 23(a)(4).  "The proper resolution of this issue requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000).  Here, without considering the settlement itself (which, as discussed below, contains some indicia of collusiveness and reflects that the named plaintiff and class counsel may have favored their own interests when reaching the settlement), this requirement is satisfied because there is no obvious conflict between Hofmann's interests and those of the class members.

### 5.   Adequacy of Class Counsel

A court certifying a class must consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R.Civ. P. 23(g)(1)(A).  The Court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."  Fed. R.Civ. P. 23(g)(1)(B).  Ultimately, when only one applicant seeks appointment as class counsel, the court must determine that "[c]lass counsel . . . fairly and adequately represent the interests of the class." Fed. R.Civ. P. 23(g)(4).  Here, class counsel has provided evidence of his and his firm's experience litigating consumer class actions such as this one, and there is nothing in the record to suggest that counsel could not able to fairly and adequately represent the class.  Accordingly, the Court finds this element satisfied for the purposes or certification of the settlement class.

### 6.   Predominance and Superiority

"In addition to meeting the conditions imposed by Rule 23(a), the parties seeking class certification must also show that the action is maintainable under Fed. R.Civ. P. 23(b)(1), (2) or (3)."  *Hanlon*, 150 F.3d at 1022.  "Rule 23(b)(3) permits a party to maintain a class action if . . . the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Connecticut Ret. Plans & Trust Funds v. Amgen Inc.*, 660 F.3d 1170, 1173 (9th Cir. 2011), *aff'd*, 133 S. Ct. 1184, 185 L. Ed. 2d 308 (2013) (citing Fed. R.Civ. P. 23(b)(3)).   The Ninth Circuit refers to these questions as the "predominance" and "superiority" inquiries.  *Hanlon*, 150 F.3d at 1022-23.

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Id*. (quoting *Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).  "[T]he presence of commonality alone is not sufficient. . . ."

*Id.* Further, "[s]ettlement benefits cannot form part of a Rule 23(b)(3) analysis; rather the examination must rest on 'legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement.'" *Id.* (quoting *Amchem*, 521 U.S. at 623).

Here, all of the class members allegedly purchased a mislabeled product from Defendant. The legal and factual questions common to each class member's claim predominate over any questions affecting individual class members, and a class action is superior to other methods for adjudicating this controversy. Accordingly, the Court finds that the predominance and superiority inquiries have been satisfied.

In light of the foregoing, the Court conditionally certifies the class for the purposes of settlement.

### B.    Legal Standard for Final Approval of Class Settlement

Federal Rule of Civil Procedure 23(e) instructs that "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. Pro. 23(e). "Adequate notice is critical to court approval of a class settlement under Rule 23(e)." *Hanlon*, 150 F.3d at 1025. In addition, Rule 23(e) "requires the district court to determine whether a proposed settlement is fundamentally fair, adequate, and reasonable." *Id*. at 1026. This determination requires the Court to "evaluate the fairness of a settlement as a whole, rather than assessing its individual components." *Lane v. Facebook, Inc.*, 696 F.3d 811, 818-19 (9th Cir. 2012).

"Assessing a settlement proposal requires the district court to balance a number of factors: the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement." *Hanlon*, 150 F.3d at 1026. Further, "settlement approval that takes place prior to formal class certification requires a higher standard of fairness." *Id*. However, "the question whether

a settlement is fundamentally fair within the meaning of Rule 23(e) is different from the question whether the settlement is perfect in the estimation of the reviewing court." *Lane*, 696 F.3d at 819.   Ultimately, a "district court's final determination to approve the settlement should be reversed 'only upon a strong showing that the district court's decision was a clear abuse of discretion.'" *Hanlon*, 150 F.3d at 1027 (quoting *In re Pacific Enter. Sec. Litig.*, 47 F.3d 373, 377 (9th Cir. 1995)).

### C.   Analysis

#### 1.   Adequacy of Notice

The Court approved notice of this class action and proposed settlement in the Preliminary Approval Order.   The claims administrator distributed the Notice to over 30,000 potential class members or nominees.   The administrator also published the notice on various websites and in the USA Today newspaper in an effort to reach potential class members for whom the parties did not have contact information.   *Cf. In re Toys R Us-Delaware, Inc.--Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 449 (C.D. Cal. 2014) ("When the court certifies a nationwide class of persons whose addresses are unknown, notice by publication is reasonable.").   The Notice informed the Class of the terms of the Settlement, of their right to submit a claim and receive a vest, of their right to submit objections, if any, and to appear in person or by counsel at the final approval hearing and to be heard regarding approval of the Settlement, of their right to request exclusion from the Class and the Settlement, and of the date set for the Final Approval hearing.   Adequate periods of time were provided for each of these procedures. No class members objected to the settlement or the adequacy of the Notice, and only two class members requested exclusion from the class.   Accordingly, the Court finds that the class received adequate notice.

#### 2.   Strength of Plaintiff's Case; Risk of Further Litigation; and Risk of Maintaining Class Action Status

"In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *Nat'l*

*Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004) (citation omitted).  Thus, "[w]hen assessing the strength of plaintiff's case, the court does not reach any ultimate conclusions regarding the contested issues of fact and law that underlie the merits of this litigation."  *Four in One Co. v. S.K. Foods, L.P.*, No. 2:08-CV-3017 KJM EFB, 2014 WL 4078232, at *7 (E.D. Cal. Aug. 14, 2014) (internal quotations omitted).  To that end, "a proposed settlement is not to be judged against a speculative measure of what might have been awarded in a judgment in favor of the class."  *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 526 (citation omitted).

Here, Plaintiff provides little evidence or argument related to these factors.  However, it appears to the Court that Plaintiff's case is exceedingly weak and would face a litany of challenges and risks if litigated further.  For example, the timeline of events alleged in the complaint and further explained in the instant motions reveals that Plaintiff purchased the allegedly inaccurately labeled product on June 5, 2014, and then retained counsel almost immediately to begin prosecution of this case.  Such facts could indicate that Plaintiff in fact knew of the improper labeling of the product when he purchased it and simply purchased it for the purpose of bringing a lawsuit, which in turn could impact whether Plaintiff adequately represents the interests of class members who may have actually been misled insofar as they expressly relied on the Made in the U.S.A. label when making their purchasing decision.[3]

In addition, the Court questions the extent of any actual damages suffered by Plaintiff and the class members.  If as Plaintiff alleges, he discovered that the truck he purchased was not made in the U.S.A. when he opened the package at home, he simply

---

[3] The Court notes that three weeks after this lawsuit was filed, Sonia Hofmann, represented by the same counsel as Plaintiff in this case, filed a lawsuit with a largely identical complaint asserting similar claims on behalf of a purported class of consumers who purchased jeans that were allegedly wrongfully labelled as Made in the U.S.A.  *See Hofmann v. Dutch, LLC*, CASD Case No. 3:14-CV-2418-GPC-JLB.  Although there is nothing currently in the record, the Court suspects that Sonia Hofmann is somehow related to Plaintiff here, and that such fact would likely have been discovered by the defendant in this case.  This relationship and the timing of these two lawsuits certainly raises doubts about the veracity of Plaintiff's allegation that he actually relied on the Made in the U.S.A. label when purchasing Defendant's product.

could have returned the truck and obtained a refund.  Plaintiff, and the class members, would potentially have a difficult time proving any other damages resulting from the truck having parts made outside of the United States.  Further, it is questionable whether a class could be maintained because the issue of whether a class member relied on the Made in the U.S.A. label when purchasing the truck might be an individual determination.  *See generally Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651 (D.Nev. 2009) (denying class certification of consumer class action based on allegedly false "Made in the USA" label on pet food).

Finally, the Court is aware that shortly before Plaintiff filed the instant motion for final approval, the California law concerning use of "Made in the U.S.A." labels was amended by the California legislature.  *See* 2015 Cal. Legis. Serv. Ch. 238 (S.B. 633) (WEST).[4]  Plaintiff does not mention this change in his papers, but it at least raises questions as to whether the amendment applies to Plaintiff's or any of the other class members' claims and whether Defendant's labels comply with the new law.

In sum, because the Court has serious doubts about the strength of Plaintiff's individual claims as well as the claims of the class, the likelihood of maintaining this lawsuit as a class action, and whether Plaintiff or the class will be able to prove any actual damages on a class-wide basis, even a *de minimis* settlement such as this one satisfies these factors.

### 3.    The Amount Offered in Settlement

"Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion." *Hanlon*, 150 F.3d at 1027.  "Basic to [the process of deciding whether a proposed settlement is fair, reasonable and adequate] * * * is the need to compare the

---

[4] In particular, the amendment states that "merchandise sold or offered for sale outside of California shall not be deemed mislabeled if the label conforms to the law of the forum state or country within which they are sold or offered for sale." *See* 2015 Cal. Legis. Serv. Ch. 238 (S.B. 633) (WEST) at §17533.7(e).  This language very well may eliminate the claims of some or all of the class members residing outside of California.

terms of the compromise with the likely rewards of litigation." *In re TD Ameritrade Accountholder Litig.*, 266 F.R.D. 418, 422 (N.D. Cal. 2009) (quoting *Protective Committee for Independent Stockholders of TMT Trailer Ferry Inc. v. Anderson*, 390 U.S. 414, 424–25, (1968)).  However, "[t]he fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) (citation omitted).

Here, the proposed settlement has three components: (1) Defendant's agreement to provide each class member that files a proof of claim with a child's safety vest that Defendant claims would retail for approximately \$20;[5] (2) Defendant's agreement "to donate children's riding toys (valued at \$400,000.00 at retail) to various charities, including but not limited to Toys for Tots and the Salvation Army, over the course of 5 years;" and (3) an injunction requiring Defendant to comply with California Business and Professions Code Section 17533.7 so long as the statute is in effect and in whatever amended or reinterpreted form the statute may take in the future.  In his motion for final approval, Plaintiff describes this settlement as a "tremendous overall value," "exceptional" and "a refreshing substitute in a class action settlement landscape mired with coupon settlements." The Court could not disagree more.

Almost all of Plaintiff's arguments concerning the value of the settlement are based on inflated estimates of the costs of the settlement to Defendant.  The standard, however, "is not how much money a company spends on purported benefits, but the value of those benefits to the class." *TD Ameritrade*, 266 F.R.D. at 423.  Here, there is very little relationship between the purported settlement costs to Defendant and the value to the class. As for the child safety vest, even accepting Defendant's assertion that a vest that sells for

_____

[5] In a declaration from Deanna Mohre, a representative of Defendant, that Plaintiff submitted in support of his motion for preliminary approval, Ms. Mohre estimates that the vest would retail for approximately \$20.  However, the declaration also states that the vest is similar to one that John Deere sells on the internet for 9.60€, which is approximately \$10.80 at current exchange rates.

less than $11 in Europe would sell for $20 in the United States, the *retail price* is not the cost to Defendant of providing the vests, let alone the only (or even best) estimate of the *value* obtained by the settlement class. Providing a class with a specific low-cost product that the class members had no role in choosing is far less valuable than a settlement where Defendant simply mailed each class member a check for $20 or even a $20 gift certificate for the purchase of Defendant's products of the class member's choosing. Indeed, the actual value of these vests to the class members is likely nominal and by no means unquestionably better than a coupon settlement or "exceptional" as Plaintiff claims.[6] Moreover, with fewer than 14,000 claim forms returned by class members, even using the inflated retail values stated by Defendant, the dollar value of this class reward is less than $280,000.

The next component of the settlement is Defendant's donation of children's riding toys with a *retail* value of $400,000 to various charities over the course of five years. Neither the cost of this aspect of the settlement, nor the value, if any, to the class, comes close to $400,000. First, although there is nothing in the record concerning Defendant's cost of producing these toys, it is undoubtedly far less than $400,000. Second, because the donations are spread over the course of five years, the current costs are even less. Third, the settlement agreement is sufficiently vague as to the types of toys or the charities involved that there is nothing stopping Defendant from complying with this aspect of the settlement simply by giving away leftover merchandise that it is otherwise unable to sell, further decreasing the actual costs to Defendant. Fourth, there is no indication as to

---

[6] Undoubtedly, counsel attempts to distinguish this settlement from a coupon settlements because attorney's fee awards in coupon settlements are governed by 28 U.S.C. §1712, which constrains the amount of the fee award. However, at least one court has indicated that based on the legislative history of CAFA, "a noncash benefit, even one which provides for free products, could be a coupon settlement. See 109 S. Rpt. 14 (2005) (describing settlements in which class members had the option of receiving free products, such as a free repair kit, free water, or free golf balls, as examples of coupon settlements)." *Davis v. Cole Haan, Inc.*, No. C 11-01826 JSW, 2013 WL 5718452, at *2 (N.D. Cal. Oct. 21, 2013); *but see Foos v. Ann, Inc.*, No. 11cv2794 L(MDD), 2013 WL 5352969, at *2 (S.D. Cal. Sept. 24, 2013) ("The distinction between a coupon and a voucher is that a coupon is a *discount* on merchandise or services offered by the defendant and a voucher provides for *free* merchandise or services.") (emphasis in original).

whether this donation is something Defendant would do absent the settlement here.

The Court is also unconvinced that a *cy pres* remedy is even appropriate in this case. A *cy pres* remedy is:

> a settlement structure wherein class members receive an indirect benefit (usually through defendant donations to a third party) rather than a direct monetary payment. As we recently recognized, the "cy pres doctrine allows a court to distribute unclaimed or non-distributable portions of a class action settlement fund to the 'next best' class of beneficiaries." *Nachshin v. AOL*, LLC, 663 F.3d 1034, 1036 (9th Cir. 2011). For purposes of the cy pres doctrine, a class-action settlement fund is "non-distributable" when "the proof of individual claims would be burdensome or distribution of damages costly." *See id.* at 1038.

*Lane*, 696 F.3d at 819. "*Cy pres* distributions must account for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members, including their geographic diversity." *Nachshin*, 663 F.3d at 1036.   A *cy pres* settlement "will be rejected when the proposed distribution fails to provide the 'next best' distribution." *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1308 (9th Cir. 1990).

Here, Plaintiff offers no explanation why the proof of class claims would be burdensome or distribution of damages so costly so as to warrant a *cy pres* remedy in place of a distribution directly to class members.  Indeed, the settlement already contains a procedure for submitting a proof of claim, and the distribution of vests to class claimants is almost certainly more costly than mailing a check to each claimant.  Thus, the Court is not persuaded that a *cy pres* remedy is appropriate in the first instance.

Moreover, the specific *cy pres* remedy here does not account for the nature of the lawsuit, the objectives of the underlying statutes or the interests of the silent class members. The nature of this lawsuit is the harm the Plaintiff class allegedly suffered as a result of Defendant's alleged mislabeling of its products as being made in the United States. Providing those same products to charities bears no relation to this alleged wrongdoing by Defendants or the purpose of the statutes requiring that products be correctly labeled.

Moreover, no class member will be benefited from these distributions. *Cf. Six (6) Mexican Workers*, 904 F.2d at 1309 (rejecting *cy pres* distribution because the "plan does not adequately target the plaintiff class and fails to provide adequate supervision over distribution."). Accordingly, it would be within the Court's discretion to reject the settlement on the basis of the *cy pres* distribution as well.

Finally, Plaintiff touts the injunctive relief component of the settlement as "*a tremendous value in and of itself*" and that his "mindset going into the settlement process was that the real value was in the injunctive relief that inured to the benefit of the nationwide class of consumers (both past and future)." [Doc. No. 34-1 at 16 (emphasis in original).][7] This argument strains credulity. First, the injunction here merely requires Defendant to follow the current law concerning product labeling. In other words, it does not require Defendant to do anything it is not already required to do. Such so-called "injunctive relief" is effectively meaningless. Furthermore, the class here, which consists of prior purchasers of Defendant's mislabeled products, will receive no additional benefit from a requirement that Defendant follow the law concerning the labeling of its products going forward. At best, this "injunctive relief" will only benefit future purchasers of Defendant's products, none of whom are members of the instant class.[8] Accordingly, the Court finds that the so-called "injunctive relief" component of the settlement as worthless to the class.

There are few class actions cases that are so weak they justify approval of a settlement that provides so little value to the class. This case is one of the few. Ultimately, the class claims here are so weak, and the damages, if any, so nominal, that the amount

---

[7] Elsewhere in the motion, Plaintiff proclaims that "[t]he gravity and weight of this settlement certainly lies in the permanent injunction." [Doc. No. 34-1 at 16.] Considering that the injunction is largely worthless, this acknowledgement further underscores the minimal value provided to the class with the vests.

[8] Plaintiff expressly acknowledges this reality, arguing that "the permanent injunction prevents future violations of both the federal and California 'Made in USA' standard by Defendant for the additional benefit of *future unnamed consumers*." [Doc. No. 34-1 at 15 (*emphasis* added).]

offered in settlement, though meager, is sufficient for this factor to weigh in favor of approval of the settlement.

### 4.    Extent of Discovery

"[I]n the context of class action settlements, formal discovery is not a necessary ticket to the bargaining table where the parties have sufficient information to make an informed decision about settlement."  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 459 (internal quotations and citation omitted).    Here, the parties reached a settlement in principle just three months after the lawsuit was filed, and long before any formal discovery began.    Although Plaintiff claims to have served discovery three months *after* the settlement was reached and litters his motion papers with vague descriptions of complex analyses counsel performed prior to agreeing to the settlement,[9] Plaintiff provides no specifics as to the actual information that allowed him to make an informed decision that this settlement is a reasonable result.    Nevertheless, in light of the obvious and pervasive weaknesses in Plaintiff's case, the Court finds that Plaintiff had sufficient information to make an informed decision that any settlement in which Defendant agreed to provide anything to the class would be reasonable.

### 5.    Experience of Counsel

"The recommendations of plaintiffs' counsel should be given a presumption of reasonableness."  *In re Omnivision Technologies, Inc.*, 559 F.Supp. 2d 1036, 1043 (N.D. Cal. 2008) (citation omitted).  Here, lead class counsel has provided a declaration detailing his and his law firm's experience in class action litigation, and declaring that in his judgment, the settlement is fair, reasonable and adequate and in the best interest of the class.    No party has provided any evidence contradicting the reasonableness of class counsel's recommendations concerning the settlement.    Notwithstanding the foregoing, because, as discussed below, the Court finds that the agreed upon attorney's fees award is

---

[9] For example, Plaintiff claims to have "spent a considerable amount of time creating a viable damages/restitution model that required obtaining and analyzing detailed summaries of Defendant's cost, pricing, sales and labeling information for its 38 separate product lines."  [Doc. No. 27-1 at 8.]

grossly disproportionate to the recovery by the class, the Court gives little credence to counsel's recommendation in this instance.

### 6.   Reaction of Class Members

"It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *Nat'l Rural Telecomms. Coop.*, Inc., 221 F.R.D. at 29. Here, two class members have opted out of the class,[10] but no class members have objected to the settlement. Usually, the absence of a single objection to the settlement "is compelling evidence that the Proposed Settlement is fair, just, reasonable, and adequate." *Id*. In this instance, however, the Court finds the reaction of the class is more likely attributable to a lack of actual injury and general apathy such that the responding class members viewed any recovery here as a windfall. Nevertheless, the lack of objection from the class weighs in favor of approval of the settlement.[11]

### 7.   Signs of Collusion

When, "as here, a settlement agreement is negotiated prior to formal class certification, consideration of [the above] factors alone is not enough to survive appellate review." *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011). "The dangers of collusion between class counsel and the defendant, as well as the need for additional protections when the settlement is not negotiated by a court-designated class representative, weigh in favor of a more probing inquiry than may normally be required under Rule 23(e)." *Hanlon*, 150 F.3d at 1026. Thus, a final approval order in this circumstance must show "that the settlement is 'not [] the product of collusion among the negotiating parties.'" *Bluetooth*, 654 F.3d at 947 (quoting *In re Mego Fin. Corp. Sec. Litig.*,

---

[10] One of the class members who opted out of the settlement stated: "This is my 'request for exclusion'! This is a waste of time and money for the court system. I want <u>NO</u> part of this!" [Doc. No. 34-3 at 50] (emphasis in original).

[11] On the other hand, this settlement provides such little value to the class (in contrast with the incentive and attorney's fees award requested) that if even one class member had objected, the Court likely would have sustained that objection and declined to approve this settlement.

213 F.3d at 458).

Along these lines, courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Id.* Examples of such subtle collusion include:

(1)   "when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded," *Id.* (quoting *Hanlon*, 150 F.3d at 1021);

(2)   "when the parties negotiate a 'clear sailing' arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries 'the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class,'" *Id.* (quoting *Lobatz v. U.S. W. Cellular of Cal., Inc.*, 222 F.3d 1142, 1148 (9th Cir. 2000)); and

(3)   "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund," *Id.* (citing *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 785 (7th Cir. 2004) (Posner, J.)).

Here, the settlement agreement includes all of these warning signs.  First, the settlement's provision for $375,000 in attorney's fees is disproportionate to the nominal benefit received by the class from the settlement.  As discussed above, the most generous computation of the value of the vests, which are the only direct benefit to the class, is far less than $280,000.  The requested fee award exceeds even this grossly inflated estimate. Second, the settlement contains a "clear sailing" agreement whereby attorney's fees are separate and apart from class fund.  Third, any unawarded fees revert to Defendant and not to the class fund.  In light of the foregoing, the Court finds that the settlement, when factoring in the amount of the attorney fee and proposed lead plaintiff incentive award, is more likely than not the product of collusion among the parties.

### 8.   Balancing of the Factors

"Ultimately, the district court's determination is nothing more than an amalgam of

delicate balancing, gross approximations and rough justice." *Officers for Justice*, 688 F.2d at 625 (citation omitted).  In most circumstances, the apparent collusion here would require rejection of the settlement.  However, the Court is mindful that "rejection of a settlement creates not only delay but also a state of uncertainty on all sides, with whatever gains were potentially achieved for the putative class put at risk." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003)  Further, the "reason for more exacting review of class settlements reached before formal class certification is to ensure that class representatives and their counsel do not secure a disproportionate benefit at the expense of the unnamed plaintiffs who class counsel had a duty to represent." *Lane*, 696 F.3d at 819 (internal quotations omitted).  With these principles in mind, and in light of the weaknesses of Plaintiff's case and the lack of measurable damages to the class members, the Court finds that the instant motions are best resolved not by rejecting the settlement, but by bringing the attorney's fee and class representative incentive awards in line with the benefits received by the class.  Accordingly, notwithstanding the minimal value provided to the class and the indicia of collusion that surround the settlement, the Court finds that the settlement is sufficiently adequate to justify final approval.

### III.    Attorney's Fees

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R.Civ. P. 23(h).  However, "courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *Bluetooth*, 654 F.3d at 941.  That Defendant agreed in the settlement not to oppose Plaintiff's counsel's request for up to $375,000 in fees "does not detract from the need carefully to scrutinize the fee award." *Staton*, 327 F.3d at 964.  "Where a settlement produces a common fund for the benefit of the entire class, courts have discretion to employ either the lodestar method or the percentage-of-recovery method." *Bluetooth*, 654 F.3d at 942.    Here, there is no common fund, so the lodestar method is most appropriate.  *See generally id.* at 941 (noting that the lodestar method is appropriate when the relief is

primarily injunctive in nature and not easily monetized).

When using the lodestar method, "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). "The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly." *Id.* at 433. Excessive, redundant, and unnecessary hours should be excluded. *Id.* at 434. Further, the court must adjust the lodestar figure to account for "a host of 'reasonableness' factors, including the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment. Foremost among these considerations, however, is the benefit obtained for the class." *Bluetooth*, 654 F.3d at 942 (internal citations and quotations omitted).

Here, Plaintiff's counsel claims to have worked 943.4 hours on this case at rates varying between $175 for a paralegal, to $495 for the supervising partner. The only evidence Plaintiff's counsel provides in support of the reasonableness of these hours and rates is a declaration providing vague and general descriptions of the work allegedly performed. *See generally Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986) ("[C]ounsel bears the burden of submitting detailed time records justifying the hours claimed to have been expended"). The motion and declaration emphasize that this litigation has been pending for almost a year and a half, but completely ignore that the settlement in principle was reached just three months into the litigation and long before any discovery occurred. Ultimately, counsel has not satisfied its burden of supporting its grossly inflated hours request, and in any event, counsel's claim that 943 hours were reasonably expended litigating this case is utterly preposterous.[12] In light of this lack of

---

[12] The declaration from class counsel states in a footnote that they are willing to provide their billing records for *in camera* review. Putting aside that counsel fails to explain why such records would be privileged, when reviewing a fee request, the Court is "neither obligated to explain what type of records should be submitted, nor to request additional information." *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1306 (9th Cir. 1994). In any event, considering the totality of the circumstances

evidence supporting the reasonableness of its fees, along with the paltry recovery obtained for the class, the Court would be within its discretion to deny a fee award entirely.  *See, e.g., Brown v. Stackler*, 612 F.2d 1057, 1059 (7th Cir. 1980) (affirming complete denial of petition for attorney's fees because the claim for fees was "outrageously excessive").[13]

Nevertheless, the Court acknowledges that Plaintiff's counsel did some work on this case and therefore the Court will enter an appropriate award.  Without competent evidence to support the number of hours actually worked by counsel, the Court is must calculate a reasonable number of hours based on its own experience.  To that end, the Court determines that 50 hours is a reasonable amount of time to have spent on this matter, broken down as follows:

- Meeting with lead plaintiff and drafting complaint – 10 hours
- Drafting mediation brief and attending mediation – 12 hours
- Finalizing settlement terms and drafting settlement agreement – 10 hours
- Drafting motions for preliminary and final approval – 15 hours
- Miscellaneous filings and conferences prior to mediation – 3 hours

The Court declines to award counsel for any time purportedly spent on discovery that occurred *after* a settlement had been reached and which appears to have served for no other purpose than run up fees prior to seeking approval of the settlement.

As for rates, the Court is satisfied that the rates charged by Plaintiff's counsel are reasonable in this jurisdiction for this type of litigation.  Because an associate should have been capable of performing the majority of the work (including drafting the complaint,

---

surrounding this litigation and the sheer absurdity of counsel's claim that it was reasonable to bill 943 hours on a case that settled in three months with a nominal recovery for the class, billing records purportedly reflecting these 943 hours would be of little assistance to the Court in determining a reasonable loadstar award here.

[13] The *Brown* court concluded that: "[i]f, as appellant argues, the Court were required to award a reasonable fee when an outrageously unreasonable one has been asked for, claimants would be encouraged to make unreasonable demands, knowing that the only unfavorable consequence of such misconduct would be reduction of their fee to what they should have asked for in the first place. To discourage such greed a severer reaction is needful, and the District Court responded appropriately in the case at bar."). *See Brown*, 612 F.2d at 1059.

settlement agreement, and motions), the Court will use the associate rate of $375 per hour for 30 of the hours, and the partner rate of $495 per hour for the remaining 20 hours.  This results in a lodestar calculation of $21,150.

However, the Court is required to adjust the lodestar based on various factors, including the amount of benefit to the class.  As discussed at length above, the Court finds that the settlement here provides hardly any benefit to the class.[14]  Indeed, the only benefit to the class is the nominal value of the vests given to the class members that completed a claim form.  This result warrants a downward adjustment of the lodestar.  *Bluetooth*, 654 F.3d at 942 (holding that the foremost consideration in determining reasonableness of fee award is the benefit obtained for the class); *see also In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1182 (9th Cir. 2013) ("Attorney's fees are never attributable to an attorney's work on the action. They are attributable to the relief obtained for the class.").  In the Court's estimation, a generous estimate of the total benefit to the class of the vests is $45,000.[15]  If this were a common fund case with $45,000 from the common fund allocated to the class, a fee award using the Ninth Circuit benchmark of 25% of the common fund would be $15,000.  *See generally Bluetooth*, 654 F.3d at 942 ("[C]ourts typically calculate 25% of the [common settlement] fund as the 'benchmark' for a reasonable fee award.").  The Court finds that a downward adjustment of the lodestar to $15,000 is an appropriate fee award based on the nominal benefit obtained for the class here.

_____

[14] The Court has reconsidered its finding to the contrary in the order preliminarily approving the settlement.  Among other things, the preliminary approval motion caused the Court to believe that the number of claim forms submitted would be substantially larger in light of the number of allegedly mislabeled class products sold by Defendant during the class period, which would have resulted in a substantially larger total benefit to the class.

[15] This estimate comes out to approximately $3.25 per vest (or roughly a third of their retail value in Ireland.  Further, even if the injunctive relief component of this settlement had any value to the class, it would be inappropriate to factor that value into a fee award based on the percentage of the recovery by the class.  *See generally Staton*, 327 F.3d at 974 ("We hold, therefore, that only in the unusual instance where the value to individual class members of benefits deriving from injunctive relief can be accurately ascertained may courts include such relief as part of the value of a common fund for purposes of applying the percentage method of determining fees.").

## IV.       Expenses

Class Counsel also seek $10,365.00 in actual litigation costs and expenses but offers no evidentiary support for these costs.  Nor can the Court determine on its own why a case that settled three months after filing and before any discovery would result in expenses of over $10,000.  Normally, the Court would at least award counsel the $400 fee for filing this case in this court, but Plaintiff did not file the case here, and there is no evidence of any fee paid to file the original complaint in state court.  Accordingly, counsel's request for expenses is denied.

## V.       Enhancement Award to Class Representative

Finally, lead plaintiff Eric Hofmann asks for a $5,000 incentive award.  Although "incentive awards are fairly typical in class action cases," they are discretionary. *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009).  "Generally, when a person joins in bringing an action as a class action he has disclaimed any right to a preferred position in the settlement."  *Staton*, 327 F.3d at 976 (internal ellipses, quotations, and citation omitted).  The purpose of incentive awards, therefore, is "to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general."  *Rodriguez*, 563 F.3d at 958-59.  However, "district courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives."  *Radcliffe v. Experian Info. Solutions Inc.*, 715 F.3d 1157, 1164 (9th Cir. 2013).

As discussed above, the benefit of this settlement to the class is nominal and to provide Hofmann with a $5,000 incentive award would be an abuse of discretion.  Even giving the vests the full exaggerated $20 value touted by the parties, $5,000 is 250 times this amount.  Moreover, this case settled in mediation after three months, there is no evidence that Hofmann suffered any financial or reputational risk in filing this lawsuit, and Hofmann did not even bother to attend the mediation in person and could not possibly have spent more than a couple hours of his time on this matter.  Accordingly, the request for an

incentive award is denied.

**VI.    Conclusion**

For all of the foregoing reasons, it is hereby ORDERED as follows:

1.      The motion for final approval of the class action settlement [Doc. No. 34] is **GRANTED**, and the parties are ordered to perform the terms of the Settlement Agreement at Docket No. 27-2.

2.      The Motion for Attorneys' Fees [Doc. No. 35] is **GRANTED IN PART**.

3.      The request for an incentive award for class representative Eric Hofmann is **DENIED.**

4.      The class is certified for settlement purposes only.

5.      The Court approves an award to class counsel of $15,000 in attorney's fees, but no costs or expenses, to be paid by Defendant within ten (10) business days from the date of this Order.

6.      This lawsuit and all of the claims contained herein are **DISMISSED WITH PREJUDICE**.  The Parties are to bear their own costs, except as otherwise provided in the Settlement Agreement or this Order.

It is **SO ORDERED**.

Dated:  October 15, 2015

_____
Hon. Cathy Ann Bencivengo
United States District Judge